OPINION
{¶ 1} Defendant-appellant Shawn Hahn appeals his conviction and sentence from the Perry County Court of Common Pleas on one count of possession of drugs. Plaintiff-appellee is the State of Ohio.
 STATEMENT OF THE FACTS AND CASE {¶ 2} On January 21, 2005, the Perry County Grand Jury indicted appellant on one count of possession of drugs in violation of R.C.2925.11(A) and (C)(3)(d), a felony of the third degree. At his arraignment on February 9, 2005, appellant entered a plea of not guilty to the charge.
 {¶ 3} Thereafter, on March 15, 2005, appellant filed a Motion to Suppress. Appellant, in his motion, argued that his wife, Tiffany Hahn, lacked capacity to consent to a search of the couple's home and that, therefore, the evidence seized as a result of such search should be suppressed.
 {¶ 4} A suppression hearing was held on June 16, 2005. The following testimony was adduced at the hearing.
 {¶ 5} On September 4, 2004, Deputy Scott Ervin of the Perry County Sheriffs Office was dispatched to appellant's home in response to a domestic dispute. When he arrived at appellant's home, he observed Deputy John Russell speaking with appellant's wife, Tiffany. According to Deputy Ervin, Tiffany was upset, but appeared to be talking coherently, had no trouble with her balance and did not appear to be intoxicated. Deputy Ervin, however, did not talk to Tiffany face-to-face.
 {¶ 6} Deputy Ervin testified that he was in appellant's house checking for other suspects since it was his understanding that more than one person was involved in the domestic dispute. After finding no other people in appellant's house, the deputy exited the house and told Sheriff William Barker and Deputy John Russell that they needed to enter the residence since he thought he saw marijuana in the same.
 {¶ 7} On cross-examination, Deputy Ervin testified that when the radio call came in about the alleged domestic dispute, "there was mention of a naked lady running down the middle of the highway and someone was trying to run over her." Transcript at 9. He further testified that there was mention of possibly one other male being involved in the incident. As is stated above, Deputy Ervin did not find any other suspects in the house.
 {¶ 8} Perry County Sheriff William Barker was the next witness to testify at the hearing. Sheriff Barker testified that he responded to the scene because "[i]t sounded quite urgent." Transcript at 12. When he arrived on the scene, he observed Deputy Russell and a woman who was "lightly clothed", outside the residence. Transcript at 14. The woman called him by name. Sheriff Barker testified that when he asked the woman her name, "she engaged in conversation with me then; identifying she knew who I was, my daughter and my grandson." Transcript at 14. Sheriff Barker talked with Tiffany for a couple of moments and then, when appellant exited the house, he approached appellant. He later went back and spoke with Tiffany to secure permission to enter the house after Deputy Ervin reported seeing marijuana plants growing in the same. After appellant was arrested, Tiffany signed a consent to search form after Deputy Russell read the same to her.
 {¶ 9} Sheriff Barker testified that since they had information that Tiffany might have been at a party with appellant and might be intoxicated, he made sure that she understood what she was signing. According to the sheriff, Tiffany appeared to be upset, but appeared to understand that she was giving permission to search her house. When asked what led him to this conclusion, Sheriff Barker testified as follows:
 {¶ 10} "A: Her conversation and acknowledging that she knew me and I did not identify myself to her. She knew my family, my daughter, and my grandson. We engaged in that conversation for a while. I did not detect any slurred speech that would lead me to believe she was under the influence of any alcohol that might alter her ability to make a rational decision and I felt that she very clearly understood the consequences of that. She had expressed a great concern and fear that if she signed that of retaliation by Mr. Hahn. And we explained to her that he was under arrest and that she had a process. She could apply for a protection order through the court to protect her if she feared of further violence.
 {¶ 11} "Q: Was there any indication that she had been drinking?
 {¶ 12} "A: We had information that they had been at a party. They had been at a wedding. There was probably some alcohol consumed there. I was under the impression it had taken place a few hours prior to this.
 {¶ 13} "Q: But did you see or smell or have any indication that she personally had been consuming alcohol?
 {¶ 14} "A: I would say she had a slight odor of alcohol about her, yes sir.
 {¶ 15} "Q: How about her complexion and her eyes, how did they appear?
 {¶ 16} "A: Well, she had some facial injury there, if I recall right. She had been in some type of a struggle so to differentiate between the two whether she was flushed because of alcohol or because of injury I'm not certain. But I did noticed [sic] some redness about her face. I believe she had some injury to her hands or maybe here on her arms as if she had fallen or been involved in some type of a struggle.
 {¶ 17} "Q: Did her eyes appear to be blood shot or glassy?
 {¶ 18} "A: I would say there was probably some slight sign of that sir.
 {¶ 19} "Q: Did she have any trouble standing and talking with you?
 {¶ 20} "A: No. she walked all around Deputy Russell and I right there and stood there. We stood outside that residence there for quite a number of minutes explaining to her this particular procedure here, of signing the consent to search. We stood outside there for quite some time.
 {¶ 21} "Q: She did not exhibit any signs that she did not understand your explanation?
 {¶ 22} "A: Not to me sir, no." Transcript at 18-19. The sheriff, when asked, testified that he did not believe that Tiffany was under the influence of alcohol to a degree to "impede her decision." Transcript at 19.
 {¶ 23} Perry County Deputy Lee Findlay also testified at the suppression hearing. When Deputy Findlay arrived on the scene, Tiffany recognized him and called him by his first name. The deputy testified that he had not seen Tiffany, who was related to one of his former relatives, for approximately ten years. Deputy Findlay testified that he could smell alcohol on Tiffany's breath, but that there was no evidence that she was intoxicated to the point where she did not understand what was going on. According to the deputy, Tiffany's speech was not slurred and she did not have any problem with her balance. The deputy further testified that Tiffany's eyes were red and that she was crying when he arrived on the scene.
 {¶ 24} At the suppression hearing, Deputy Sheriff John Russell of the Perry County Sheriff's Office also testified. Deputy Russell testified that when he arrived at appellant's house, a naked female was in the yard. The deputy identified the female as Tiffany Hahn. According to the deputy, Tiffany was running towards him with appellant behind her. Deputy Russell testified that he then radioed his office and told it that he had two suspects approaching him in the driveway and also told Tiffany to go into the house and put on some clothes.
 {¶ 25} Deputy Russell further testified that he read the consent to search form verbatim to Tiffany. According to Deputy Russell, Tiffany indicated that she understood what was going on, but that she was scared for her life. When asked if Tiffany showed signs of intoxication, Deputy Russell testified that Tiffany smelled of alcohol but appeared to be coherent and was able to explain the events of the evening to him. Deputy Russell also testified that Tiffany had no problem with balance and "understood everything because she followed everything I asked her to do. So I think she was completely capable of understanding everything I said. Transcript at 46.
 {¶ 26} On cross-examination, Deputy Russell testified that Tiffany was aware of the marijuana in the house and voiced concerns that she would be in trouble because of the same.
 {¶ 27} After the State rested, appellant called Jeffrey Hannan, Tiffany's father, to the stand. Hannan testified that Tiffany called him on September 4, 2004, and asked him to come get her at the hospital where she had been transported. According to Hannan, Tiffany was "pretty intoxicated" when he picked her up between 10:00 and 11:00 P.M. Transcript at 53. Hannan further testified that Tiffany's eyes were red, her speech was slurred, she was not acting normally and she was not mentally coherent. According to Hannan, when he took Tiffany to the sheriffs office the next morning to rewrite her statement, she was hung over.
 {¶ 28} At the suppression hearing, Tiffany testified that she had been with appellant at a wedding reception on the afternoon of September 4, 2004, and that she drank one drink after another. According to Tiffany, the two left the wedding reception because she was drunk and was having trouble keeping her balance and behaving. Tiffany further testified that she was intoxicated, having trouble keeping her balance and slurring her words when she spoke with Deputy Russell and was still intoxicated when her father picked her up later that evening at the hospital.
 {¶ 29} During her testimony, Tiffany testified that she recalled writing a statement of what happened on the night in question. She further testified that she did not sign the consent to search form voluntarily, but did so after being threatened that she could go to jail if she did not sign the same.
 {¶ 30} On cross-examination, Tiffany testified that she did not know that Sheriff Barker had a grandson and did not remember talking to Deputy Findlay.
 {¶ 31} Appellant also testified at the suppression hearing. Appellant, who was a groomsman at the wedding, testified that he left the wedding reception with Tiffany after she threatened four times to beat up the bridesmaid with whom he was paired. According to appellant, Tiffany drank twelve drinks, her speech was slurred and she was really loud and her balance was impaired.
 {¶ 32} As memorialized in an Entry filed on July 11, 2005, the trial court denied appellant's Motion to Suppress without giving its reasons for doing so. Thereafter, on July 13, 2005, appellant pleaded no contest to possession of drugs in violation of R.C. 2925.11(A) and (C)(3)(d). Pursuant to a Judgment Entry filed on August 31, 2005, appellant was sentenced to one year in prison and fined $1,000.00. In addition, his driver's license was suspended for a period of six (6) months.
 {¶ 33} Appellant now raises the following assignment of error on appeal:
 {¶ 34} "THE TRIAL COURT ERRED BY OVERRULING DEFENDANT'S MOTION TO SUPPRESS TANGIBLE EVIDENCE AND STATEMENTS."
 I {¶ 35} Appellant, in his sole assignment of error, argues that the trial court erred in denying appellant's Motion to Suppress. Appellant specifically contends that Tiffany's consent to search the premises was not valid due to her intoxication.
 {¶ 36} Preliminarily, we note that the following standard governs our review of a trial court's decision regarding a motion to suppress: "[W]e are bound to accept the trial court's findings of fact if they are supported by competent, credible evidence. Accepting those facts as true, we must independently determine as a matter of law, without deference to the trial court's conclusion, whether they meet the applicable legal standard." State v. Retherford (1994),93 Ohio App.3d 586, 592, 639 N.E.2d 498; State v. Curry (1994), 95 Ohio App.3d 93; State v. Claytor (1993), 85 Ohio App.3d 623; State v. Guysinger (1993),86 Ohio App.3d 592. In a motion to suppress, the trial court assumes the role of trier of fact, and, as such, is in the best position to resolve questions of fact and evaluate witness credibility. State v.Guysinger (1993), 86 Ohio App.3d 592, 594, 621 N.E.2d 726. (Citations omitted). In Seasons Coal Co. v. Cleveland (1984), 10 Ohio St.3d 77, 81,461 N.E.2d 1273, the Ohio Supreme Court explained: "[a] reviewing court should not reverse a decision simply because it holds a different opinion concerning the credibility of the witnesses and evidence submitted before the trial court. A finding of an error in law is a legitimate ground for reversal, but a difference of opinion on credibility of witnesses and evidence is not." See, also State v.DeHass (1967), 10 Ohio St.2d 230, syllabus 1.
 {¶ 37} Crim. R. 12(F) requires a court ruling on a pre-trial motion to state its essential findings on the record if, as in the case sub judice, factual issues are involved.
 {¶ 38} In order to invoke this provision, trial counsel must request the trial court to state its essential findings of fact on the record.State v. Benner (1988), 40 Ohio St.3d 301, 317, 533 N.E.2d 701, abrogated in part on other grounds by Horton v. California (1990),496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112.; State v. Richey (1992),64 Ohio St.3d 353, 366, 595 N.E.2d 915, 927, abrogated in part on other grounds by State v. McGuire (1997), 80 Ohio St.3d 390, 402,1997-Ohio-335, 686 N.E.2d 1112, 1122; State v. Brown (1992),64 Ohio St.3d 476, 481, 597 N.E.2d 97, 101. ([The defendant's] failure to invoke the rule waived any error). State v. Williams (1977), 51 Ohio St.2d 112,364 N.E.2d 1364. State v. Eley (1996), 77 Ohio St.3d 174, 179,672 N.E.2d 640, superseded by constitutional amendment in part State v.Smith (1997), 80 Ohio St.3d 89, 103 at n. 4, 684 N.E.2d 668, 684.
 {¶ 39} While it is error for the trial court to fail in providingrequested findings of fact, it is not prejudicial where the record provides an appellate court with a sufficient basis to review the assignments of error. State v. Benner, supra, at 317-318,533 N.E.2d 701; State v. Loza (1994), 71 Ohio St.3d 61, 73, 641 N.E.2d 1082, 1098. ["Upon an independent review of the record, we find the evidence supports the denial of appellant's motion to suppress."]. State v.Alexander (1997) 120 Ohio App.3d 164, 169, 697 N.E.2d 255, appeal dismissed, 80 Ohio St.3d 1408, 684 N.E.2d 702; State v. Jarvis (May 12, 2000), 6th Dist. No. L-99-1184; State v. Gibson (July 7, 1999), 9th Dist. No. 97CA006967.
 {¶ 40} The record shows that appellant did not ask the court for findings of fact relating to the motion to suppress. Although the record is devoid of the trial court's findings of facts, the record is sufficient to allow a full review of appellant's claim on appeal regarding his motion to suppress. The transcript from the motion to suppress hearing provides this court with a sufficient basis to determine whether the trial court's decision was supported by competent, credible evidence. State v. Sapp, 2nd Dist. No. 99CA84, 2002-Ohio-6863 at ¶ 59. See also, State v. Brown (1992), 64 Ohio St.3d 476, 482,1992-Ohio-96, 597 N.E.2d 97, 101. ["Accordingly, we hold that when a defendant makes no request to the trial court to state findings of fact in support of an order overruling a motion to dismiss on speedy trial grounds, and the trial court does not state its findings of fact, an appellate court errs in reversing a conviction on the ground that the defendant was denied a speedy trial if there is sufficient evidence demonstrating that the trial court's decision was legally justified and supported by the record".]; State v. Loza, supra.
 {¶ 41} In the case at bar, the State attempted to justify the officer's entry into the home on the basis that appellant's wife, Tiffany, consented to the intrusion.
 {¶ 42} "[W]hen the subject of a search is not in custody and the State attempts to justify a search on the basis of his consent, the Fourth and Fourteenth Amendments require that it demonstrate that the consent was in fact voluntarily given, and not the result of duress or coercion, express or implied. Voluntariness is a question of fact to be determined from all the circumstances, and while the subject's knowledge of a right to refuse is a factor to be taken into account, the prosecution is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent." Schneckloth v. Bustamonte (1973), 412 U.S. 218,248-49 93 S.Ct. 2041, 2059, 36 L.Ed.2d 854,875.
 {¶ 43} Appellant, on the other hand, does not argue that Tiffany refused to give consent for the officer to enter the home. Rather, he contends that she was too intoxicated to have knowingly, intelligently and voluntarily consented to the entry.
 {¶ 44} Evidence of intoxication, without more, does not compel the conclusion that an individual's decision to waive his or her constitutional rights was made involuntarily and must be suppressed.State v. Stewart (1991), 75 Ohio App.3d 141, 147, 598 N.E.2d 1275;State v. Christopher (April 27, 1989), Montgomery App. No. 10870. The standard is whether, by reason of intoxication or other factor, the individual's "will was overborne" or whether his consent was the "product of a rational intellect and a free will." Townsend v. Sain
(1963), 372 U.S. 293, 307, 83 S.Ct. 745, 754; Colorado v. Connelly
(1986), 479 U.S. 157, 164,107 S.Ct. 515, 164. ["While a defendant's mental condition may be a `significant' factor in the `voluntariness' calculus, this does not justify a conclusion that his mental condition, by itself and apart from its relation to official coercion, should ever dispose of the inquiry into constitutional `voluntariness.'"].
 {¶ 45} As an appellate court, we neither weigh the evidence nor judge the credibility of witnesses. Our role is to determine whether there is relevant, competent and credible evidence upon which the fact finder could base its judgment. Cross Truck v. Jeffries (February 10, 1982), Stark App. No. CA-5758.
 {¶ 46} As noted in the Statement of Facts, supra, the record contains competent, credible evidence in the form of the testimony of the officers who responded to the scene that Tiffany's consent was freely and voluntarily given. Although she had been drinking the officers testified that her consent was the "product of a rational intellect and a free will." Although the appellant testified and presented testimony that Tiffany was intoxicated and had been threatened with arrest if she did not consent to the search of her home, the trier of fact was free to accept or reject any and all of the evidence offered by the appellant and assess the witness's credibility. Indeed, the trier of fact need not believe all of a witness' testimony, but may accept only portions of it as true. State v. Raver, Franklin App. No. 02AP-604, 2003-Ohio-958, at ¶ 21, citing State v. Antill (1964), 176 Ohio St. 61, 67,197 N.E.2d 548.; State v. Burke, Franklin App. No. 02AP-1238, 2003-Ohio-2889, citing State v. Caldwell (1992), 79 Ohio App.3d 667, 607 N.E.2d 1096.
 {¶ 47} Based upon the above evidence, we conclude the state met its burden in establishing that Tiffany knowingly, voluntarily and intelligently waived her rights. Tiffany's will was not overborne by the level of alcohol in her system at the time of the officer's obtained her consent to search the residence. The record also indicates she was not physically deprived or mistreated. Accordingly, Tiffany's consent was the "product of a rational intellect and a free will".
 {¶ 48} Subsequent to the trial court's decision in the case at bar overruling appellant's motion to suppress, the United State Supreme Court held that "a warrantless search of a shared dwelling for evidence over the express refusal of consent by a physically present resident cannot be justified as reasonable to him on the basis of consent given to the police by another resident." Georgia v. Randolph (2006),126 S.Ct. 1515, 1526, 164 L.Ed.2d 208.
 {¶ 49} In the case at bar, the record establishes that Sheriff Barker and Officer Ervin made contact with the appellant on the front porch of the residence. Sheriff Barker asked if they could enter the residence and look for other suspects. (T. at 5). Officer Ervin testified that the appellant affirmatively gestured to go ahead and look. (T. at 79). Sheriff Barker testified that the appellant verbally told him they could go ahead and look as he gestured that it was alright. (T. at 22-23; 28; 93). Deputy John Russell testified that appellant verbally consented to the officers entering the house. (T. at 40-41).The appellant testified that he denied them access and told Officer Ervin to get the hell out. (T. at 75; 76). Both Sheriff Barker and Officer Ervin denied that he ever said this and asserted that permission to enter was granted. (Tr. at 79; 93).
 {¶ 50} Accordingly, the record contains competent, credible evidence in the form of the testimony of the officers who responded to the scene that appellant consented to the search of the home.
 {¶ 51} In Georgia v. Randolph, supra, the Court made the following observation relevant to the case at bar: "But this case has no bearing on the capacity of the police to protect domestic victims. The dissent's argument rests on the failure to distinguish two different issues: when the police may enter without committing a trespass, and when the police may enter to search for evidence. No question has been raised, or reasonably could be, about the authority of the police to enter a dwelling to protect a resident from domestic violence; so long as they have good reason to believe such a threat exists, it would be silly to suggest that the police would commit a tort by entering, say, to give a complaining tenant the opportunity to collect belongings and get out safely, or to determine whether violence (or threat of violence) has just occurred or is about to (or soon will) occur, however much a spouse or other cotenant objected. (And since the police would then be lawfully in the premises, there is no question that they could seize any evidence in plain view or take further action supported by any consequent probable cause, see Texas v. Brown, 460 U. S. 730, 737-739 (1983) (plurality opinion).) Thus, the question whether the police might lawfully enter over objection in order to provide any protection that might be reasonable is easily answered yes. See 4 LaFave § 8.3(d), at 161 ("[E]ven when . . . two persons quite clearly have equal rights in the place, as where two individuals are sharing an apartment on an equal basis, there may nonetheless sometimes exist a basis for giving greater recognition to the interests of one over the other. . . . [W]here the defendant has victimized the third-party . . . the emergency nature of the situation is such that the third-party consent should validate a warrantless search despite defendant's objections" (internal quotation marks omitted; third omission in original)). The undoubted right of the police to enter in order to protect a victim, however, has nothing to do with the question in this case, whether a search with the consent of one cotenant is good against another, standing at the door and expressly refusing consent".
 {¶ 52} In the case at bar, the officers testified that they were dispatched to appellant's home in response to a domestic dispute. The record contains evidence that Tiffany had some facial injury, as well as injury to her hands and arms. (T. at 43). When Deputy Ervin arrived, appellant was inside the house. (T. at 5). The officer entered the home to make a sweep for other individuals. (Id. at 5; 11). The officers believed that more than one suspect was involved in the dispute with Tiffany. (Id. at 16; 21; 24-25). The officers entered the residence to insure that it was safe for Tiffany to return. (T. at 30). The marijuana was in plain view inside the house. (Id. at 9-10).
 {¶ 53} In the case at bar, where the defendant has victimized the third-party the emergency nature of the situation is such that the third-party consent should validate a warrantless search despite appellant's objections. Georgia v. Randolph, supra.
 {¶ 54} The record in the case at bar provides this court with a sufficient basis to determine that the trial court's decision overruling appellant's motion to suppress was supported by competent, credible evidence.
 {¶ 55} Appellant's sole assignment of error is overruled.
 {¶ 56} Accordingly, the judgment of the Perry County Court of Common Pleas is affirmed.
By: Gwin, P.J., Hoffman, J., and Edwards, J., concur.
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion on file, the judgment of the Perry County Court of Common Pleas is affirmed. Costs assessed to appellant.